## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

-against-

DHARMA TEJA NUKARAPU,
SHARKDREAMS, INC. (A/K/A FELLOW), and
D DOLLAR, INC.

Defendants.

JURY TRIAL DEMANDED

Case No. 5:23-cv-503

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC"), for its

Complaint against Defendants Dharma Teja Nukarapu ("Nukarapu"), SharkDreams, Inc.

("SharkDreams"), and D Dollar, Inc. ("D Dollar"), collectively "Defendants," alleges as follows:

## SUMMARY

1.      From at least January 2018 to November 2019 (the "Relevant Period"),

SharkDreams and its CEO, Nukarapu, fraudulently raised approximately $2.7 million from more

than 20 investors through securities offerings of SharkDreams, a purported healthcare software

development firm based in Raleigh, North Carolina.

2.      During the Relevant Period, SharkDreams and Nukarapu made multiple false and

misleading statements to current and prospective investors in connection with the offer and sale

of SharkDreams securities, including that prior investors had doubled their money in a year, that

1

SharkDreams was valued at as much as $7 million to $30 million, that SharkDreams had customer orders, and that it had a large investor who would buy out all of the remaining SharkDreams shares to infuse capital. None of this was true. SharkDreams had no revenue-producing customer orders or contracts, there was no factual basis for a valuation in the range Nukarapu touted, and there was never a bona fide offer to buy out SharkDreams shares.

3. Additionally, in 2019 and 2020, D Dollar, a company owned by Nukarapu, raised at least $650,000 from investors. Investors were told that the funds would be used for a purported D Dollar subsidiary owned by Nukarapu, Vera Smart Healthcare ("Vera"); but Nukarapu misappropriated approximately $595,000 of the investment proceeds from D Dollar to fund SharkDreams operations and for his personal uses.

## JURISDICTION AND VENUE

4. The SEC sues under Section 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

5. This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v], and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

6. Defendants, directly and indirectly, have made use of the mails or the means or instruments of interstate commerce in connection with the transactions, acts, practices, and course of business alleged herein, by, among other means, soliciting investments via the internet and accepting investor deposits via wire transfer.

7. Venue is proper in the Eastern District of North Carolina pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §

2

78aa]. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Eastern District of North Carolina and elsewhere, and were effected, directly or indirectly, by use of the means or instruments or instrumentalities of transportation or communications in interstate commerce, or of the mails. During the Relevant Period, Nukarapu resided in this District and India, and Defendants SharkDreams and D Dollar are North Carolina companies with their registered principal places of business in this District.

8. SharkDreams, D Dollar and Nukarapu executed agreements tolling the statutes of limitations for the period September 19, 2022 through September 14, 2023.

## DEFENDANTS

9. Dharma Teja Nukarapu, age 37, resides in Apex, North Carolina and in India. He co-founded and serves as CEO and majority owner of SharkDreams. He is also sole owner of D Dollar. From at least January 2018 through late 2019, he resided in the United States. In late 2019, he traveled to India and, upon information and belief, remains there, with members of his family remaining in the United States. He has since returned to the United States on occasion.

10. SharkDreams, Inc., incorporated in North Carolina in 2017 with its principal place of business in Raleigh, North Carolina, is purportedly a healthcare software development firm. It is also known by the name "Fellow," and was previously incorporated as Shark Dreams LLC. Nukarapu, its founder, owns approximately 55% of the company, which had between fourteen and twenty-nine employees from 2018 through 2020. Neither SharkDreams nor its securities have ever been registered with the SEC in any capacity.

11. D Dollar, Inc., incorporated in North Carolina with its principal place of business in Raleigh, North Carolina, purports to be a venture capital company. Nukarapu owns D Dollar.

Neither D Dollar nor its securities have ever been registered with the SEC in any capacity.

**OTHER RELATED ENTITIES**

12.     Vera Smart Healthcare ("Vera") is an Indian company, which is 95% owned by Nukarapu and 5% owned by a family member.  Vera purports to be a network of hospitals and facilities providing healthcare services in India.

**FACTUAL ALLEGATIONS**

### A.  BACKGROUND

13.     Founded by Nukarapu in 2016, SharkDreams is purported to be in the business of developing, manufacturing, and marketing a pill bottle, skin patch, and other products and services that use a proprietary web-based software, known as the LIVIT products.  These products purportedly facilitated the ability to monitor patients' compliance with medication, as well as other medical monitoring.

14.     In 2017, Nukarapu and SharkDreams sought investments in SharkDreams ostensibly to continue and expand those businesses.  During the Relevant Period, SharkDreams' business was not successful in generating revenue.  SharkDreams had only one operative customer agreement for LIVIT: an April 2018 agreement with Company A, a specialty pharmacy affiliate of a publicly traded managed care company.  This agreement provided for a free 90-day trial of SharkDreams' LIVIT pill bottle, after which the parties would negotiate a fee if Company A determined to proceed with purchasing SharkDreams' products.

15.     In the first quarter of 2019, Company A invited select patients to participate in the trial of SharkDreams' LIVIT products, but no patients signed up.  Later in 2019, SharkDreams and Company A explored a texting-based campaign to generate patient participation in the trial; however, it also was never implemented.  Then, in April 2021, Company A sent a letter to

4

SharkDreams terminating the agreement, after the relationship had been essentially dormant for almost two years.

16. Ultimately, Company A never paid SharkDreams for any LIVIT products, nor did it have any outstanding payment obligations to SharkDreams. Moreover, SharkDreams never received any revenue from any LIVIT product sales.

17. SharkDreams' failure to sell LIVIT products or otherwise generate revenue did not cause Nukarapu to give up on his venture. Instead, while SharkDreams continued to incur expenses while receiving little to no cash revenue, Nukarapu took steps to obtain operating capital from investors.

## B. NUKARAPU AND SHARKDREAMS RAISED OVER $2.7 MILLION FROM RETAIL INVESTORS

18. From at least January 2018 through June 2019, SharkDreams and Nukarapu raised at least $2.7 million from at least 20 individuals and entities in at least three securities offerings, including the sale of: (1) Simple Agreements for Future Equity ("SAFE Units"); (2) preferred shares of SharkDreams; and (3) convertible notes.

19. SharkDreams' preferred stock share offerings constituted an offer and sale of securities. In particular, Nukarapu and SharkDreams offered and sold the preferred shares in order to raise money to fund the SharkDreams business.

20. SharkDreams' convertible notes also constituted an offer and sale of securities. Nukarapu and SharkDreams also offered and sold the convertible notes in order to raise money to fund the SharkDreams business. These notes were convertible into stock shares at a later date.

21. The SAFE units that investors purchased from SharkDreams are also securities because, under their terms, they converted to shares of SharkDreams preferred stock upon certain

5

conditions, such as if SharkDreams received equity financing or had a liquidity event.

22.    Nukarapu solicited equity investments in SharkDreams from investors through the sale of these SAFE Units, preferred shares and convertible notes, including to his circle of childhood friends, his wife's work colleagues, and SharkDreams employees.

23.    Nukarapu also sought additional debt investments in SharkDreams from at least five individuals, some memorialized by promissory notes issued by SharkDreams or him personally, others without written documentation (collectively, "Notes").

24.    These Notes offered by Nukarapu and SharkDreams were also securities.

25.    Nukarapu and SharkDreams were motivated to raise money for general use in SharkDreams' business through the Notes.  The investors, who were not commercial lenders, were motivated primarily by the profit that would be generated, including the high returns they were promised.

26.    The Notes were ultimately sold to at least five purchasers, though Nukarapu solicited investments from additional persons, such as through a March 2019 investor update email in which he requested "all the existing investors to participate" in one of four investment options, including a "finance" investment with a purported twenty-five percent return.

27.    A reasonable member of the investing public would consider the SharkDreams Notes to be securities.

28.    No regulatory scheme or factor significantly reduced the risk of the SharkDreams notes, such that a court should not apply the federal securities laws to the SharkDreams Notes offering.

29.    In or around 2019, Nukarapu hired a SharkDreams finance employee (Employee

6

1) who also solicited investments on behalf of SharkDreams and D Dollar.

30.     To solicit investors, SharkDreams used "pitch decks" and private placement memoranda ("PPM").[1]  Nukarapu sent information such as these to prospective investors and conducted nearly all of the solicitations himself.  Nukarapu also solicited additional investments from existing investors by sending investor update emails that included false and misleading valuations and projections that he created or approved.

## C. NUKARAPU AND SHARKDREAMS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFER AND SALE OF SECURITIES

31.     During the Relevant Period, SharkDreams and Nukarapu made false and misleading statements to potential and existing investors when soliciting investments.  As described in further detail below, Nukarapu authored, created, or approved false and misleading SharkDreams' valuations and revenue projections sent to investors.  He also created and sent false and misleading investor update emails from his SharkDreams email account to investors. These communications to current and prospective investors included misstatements concerning SharkDreams' business, the value of the company and its securities, and a potential sale of the company.

1.     *False and Misleading Statements Concerning SharkDreams' Business Prospects*

32.     SharkDreams and Nukarapu made numerous false and misleading statements about the status of its alleged projects and about its agreements with several healthcare companies and pharmacies.

33.     For example, while continuing to solicit new investments from existing investors,

---

[1]  A PPM contains the material details about a private securities offering and is sent to prospective investors.

Nukarapu claimed in investor update emails sent to at least nine investors in January and February 2018 that Company A had given SharkDreams approval to ship LIVIT with a quantity of 18,000 per year, and that SharkDreams was in negotiations with Company A for the purchase of 50,000 LIVIT products.  These statements were false as Company A had made no such agreements or approvals to purchase the claimed quantities of LIVIT.

34.     Also in February 2018, Nukarapu sent an email update to at least ten investors that stated, among other things, that, as part of the "full launch" of LIVIT, a "demo" with Company B, a major pharmacy chain, would be scheduled in March.  But that was false, as there was not any actual or proposed "demo" between SharkDreams and Company B, or any other business relationship between SharkDreams and Company B.

35.     In an April 2018 investor update email to existing investors, Nukarapu stated that SharkDreams sold 3,000 LIVIT units for $70,000 to an unidentified Fortune 500 company when, in fact, SharkDreams had made no such sale.

36.     In the fall of 2019, Nukarapu told at least one prospective investor on a conference call that SharkDreams needed additional funds because it was rolling out its medical monitoring device product, at a fast pace.  This statement was false, because SharkDreams never sold any LIVIT products and was not rolling out its product to any paying customers, much less at a fast pace.  After the call, that individual invested $50,000 in SharkDreams.

37.     These false and misleading statements were material because a reasonable investor would have wanted to know accurate information concerning SharkDreams' customer contracts, product sales, and revenues.  Further, this type of information was important to

SharkDreams' investors.

2. *Statements Concerning SharkDreams' Value and Return on Investment*

38. During the Relevant Period, in emails to potential and actual investors, and during in-person sales pitches, SharkDreams and Nukarapu made materially false and misleading statements about the current and future valuation of SharkDreams and the value of its issued stock.

39. For example, in February 2018, to induce additional investments, Nukarapu claimed in an investor update email to existing investors that SharkDreams had "stepped up to the next level" and was worth $9-17 million.

40. In March 2019, Nukarapu claimed in an investor update email soliciting new investments that SharkDreams "is growing and heading towards $50 Million valuation," with a "current valuation of $30 million."

41. During the Relevant Period, SharkDreams did not have any paying clients for LIVIT and had not sold any LIVIT products—and ultimately never did. Accordingly, it had little to no cash revenue and was not worth anywhere near $30 million

42. Nukarapu knew, or was reckless in not knowing, that SharkDreams was not worth the current or projected amounts he represented to existing or prospective investors and had no reasonable basis for making any representations that the valuations were as high as he claimed. Accordingly, his statements concerning SharkDreams' current and projected valuations were false and misleading.

43. Similarly, Nukarapu made false and misleading statements to current and prospective investors about outsized returns earned by prior investors in order to induce initial or additional investments. For example, in February 2018, Nukarapu emailed existing investors

9

stating that "first round investors have almost doubled their investment" and a May 2018 pitch deck sent to an investor boasted SharkDreams had "doubled their investment […] financiers have made a 25% ROI [return on investment] in 12 months."

44.     Additionally, in March 2019, Nukarapu again claimed in an investor update email that "a good example to estimate your investment earning in this year, if invested $100,000, was [currently] $200,000."  In fact, as Nukarapu knew, as of February 2018, May 2018, and March 2019, investors had not received any return on their investments, and certainly had not come close to doubling their money.

45.     These statements were material because a reasonable investor would have wanted to know its actual revenues and accurate valuations of the company and its issued stock.

### 3.     *Statements Concerning Potential Sale*

46.     In late August 2019, Nukarapu made false and misleading statements regarding a potential sale of SharkDreams in order to induce current investors to send additional funds. Specifically, Nukarapu emailed investors falsely stating that SharkDreams had found buyers to "buy all the investor stock and also fund company continuously."  In that email he also claimed SharkDreams had a "$20+M valuation."  Nukarapu gave investors "only two options, 1. Sell Investor stock for approximately 160% to 200% return in hand (after 30% taxes & 15-20% service fee) [or] 2. Invest 100% more with no additional dilution or finance."  Nukarapu further stated that, for both options, a service fee or additional investment would be required to be paid right away or "heavy penalties will be imposed."

47.     The statements in this email were false and misleading because there was never any bona fide offer to buy out SharkDreams shares.  These statements were material because a

reasonable investor would have wanted to know the true nature of any buyer of SharkDreams' shares.

48. At the time he made the statements described above, Nukarapu knew or was reckless in not knowing that the statements he made and disseminated about SharkDreams, including baseless valuations and future projections, were false or misleading.

49. Nukarapu was involved in all aspects of the SharkDreams business, including authoring, reviewing, and disseminating investor materials, creating SharkDreams' valuations and projections that were sent to investors, and managing investor funds, including being the sole decision-maker regarding which noteholders/financiers were repaid. Accordingly, he knew, was reckless in not knowing, or was negligent in not knowing the falsity of statements and projections communicated to existing or prospective investors.

50. Nukarapu's conduct can be imputed to SharkDreams because he controlled the company.

**D. NUKARAPU AND SHARKDREAMS ENGAGED IN OTHER DECEPTIVE CONDUCT**

51. As described above, SharkDreams and Nukarapu raised funds from investors through the sale of Notes issued by SharkDreams and Nukarapu; some were documented as promissory notes, while no written documentation exists for others. SharkDreams and Nukarapu promised prospective and existing investors outsized returns on these debt investments.

52. At times, SharkDreams and Nukarapu offered unrealistically high interest rates far in excess of commercial lending rates – some upwards of 25% – to entice investors to provide funds to SharkDreams.

53. Many of the Notes also promised a full return on investment within a year or less. But SharkDreams did not have any realistic ability to repay the notes either at the time they were

executed or subsequently.

54.     Thus, the repayments to SharkDreams Noteholders that did occur were largely made using funds from new investments, including proceeds from new Noteholders.

55.     Moreover, in late 2019 and 2020, after not receiving promised payments of interest or principal, SharkDreams Noteholders repeatedly sent inquiries to SharkDreams and Nukarapu, who used various delay strategies in an attempt to coax the noteholders from requesting repayment of their overdue promissory notes.

56.     For example, Nukarapu sent out "lulling" emails to existing investors in an effort to give them a false sense of security and stall repayments to them. These emails included false claims such as "I think I over-delivered…as I went beyond what I promised all of you.  [L]et me put in simple terms, company can claim approximately $100M valuation based on existing work orders."

57.     In at least several instances, Nukarapu was able to persuade investors to "roll-over" the Notes for another term or "convert" the notes to a stock investment in SharkDreams— even "converting" at least one of the notes to a personal loan because, in fact, SharkDreams did not have sufficient funds (or any meaningful cash revenues) to repay it.

58.     Nukarapu continued to engage in lulling activities until this year, telling one investor in February 2023, who had been requesting repayment for years, "My apologies for the delay in communication.  If you can give me another 10 days time, as I am working on few deals currently, I will show progress from my end. I will put all the commitment for you to start seeing results... I will provide the NDA/loan payment terms in a week or two."  This investor was never repaid.

59.     A number of SharkDreams investors lacked significant investing experience, and

some were unfamiliar with Notes. For example, Investor 1 had never previously invested and had limited knowledge of convertible notes. Nonetheless, Investor 1 invested $200,000 in SharkDreams by purchasing a convertible note in 2019.

60. Some SharkDreams investors also sent funds to Nukarapu's personal bank account, where the funds were then commingled. For example, Investor 1 made his $200,000 investment by sending $100,000 to Nukarapu's personal account and $100,000 to SharkDreams' account; Investor 2 also sent his initial $50,000 investment proceeds to Nukarapu's personal account.

### E. NUKARAPU AND D DOLLAR MISUSED INVESTOR FUNDS

61. By late 2019, SharkDreams began using a purported affiliation with Vera, an Indian company in which Nukarapu had a 95% stake, as a means to solicit further investment. SharkDreams told actual and prospective investors that it had contracts with Vera and several hospitals and healthcare providers in India to supply services ranging from software infrastructure, patient management and tracking. In 2020, SharkDreams claimed that it had contracts with the Indian government for Covid-19 monitoring. However, SharkDreams ultimately received little to no actual cash from any of these contracts.

62. Starting in at least 2019, D Dollar, a company owned by Nukarapu, solicited investments in D Dollar under the pretense of using the proceeds to fund the operations of Vera. For example, in at least three instances, investors sent funds to D Dollar after being told by Employee 1, who claimed to be the "director of sales of Vera," that D Dollar was accepting investment funds for Vera or that Vera was a subsidiary of D Dollar.

63. In 2019 and 2020, Nukarapu and D Dollar misused investor funds on at least three occasions related to investments concerning D Dollar and Vera totaling approximately $650,000.

64. First, in August 2019, Employee 1 procured an approximate $100,000 loan from Investor 1 for the purpose of investing in Vera hospitals. Investor 1 made the loan to D Dollar, which Employee 1 had described as an investment corporation accepting investments for Vera. In exchange, Investor 1 was to receive a promissory note, with a two-to-three year term, a return of $5,000 in principal and $1,250 in interest per month, plus options to purchase (or the ability to convert the note into) shares of Vera and/or D Dollar. Investor 1 never received a written memorialization of the promissory note.

65. Immediately after Investor 1 wired the funds to the U.S. bank account of D Dollar, instead of being used to invest in Vera's hospitals, those funds were immediately transferred from D Dollar to a SharkDreams bank account, with $75,000 then transferred the same day from SharkDreams to Nukarapu's personal account for his personal use.

66. Second, in August 2020, two married investors sent $400,000 to D Dollar as a "short-term" investment. Employee 1 told them the investment would be "locked" for six months. Employee 1 further told them that their investment also entitled them to receive 100 shares of Vera, worth $40 each, that would appreciate by 50% to 250%. Employee 1 told these investors that Vera was a subsidiary of D Dollar.

67. Third, in September 2020, the married investors provided additional "stop-gap" financing of $150,000 to D Dollar, again under the pretense of funding Vera operations, in exchange for a promissory note. The original terms of the promissory note were for three months with an interest rate of three percent per week. Initially, they did not receive any written documentation for either investment. They later received a $150,000 promissory note issued by Vera, purportedly as a subsidiary of D Dollar, only after being told various reasons for lack of repayment and subsequently agreeing to renew the loan.

14

68.     Following both the August 2020 and September 2020 investments, the majority of the couple's funds were immediately transferred from D Dollar to a SharkDreams bank account and used to fund SharkDreams operations.

69.     In mid-2021, after the investors continued to request repayment from D Dollar representatives and Nukarapu, Nukarapu became uncommunicative.  They have not been repaid and never received any D Dollar or Vera shares.

70.     The three D Dollar/Vera investments described above, including those with terms less than nine months, constitute the offer and sale of securities.

71.     D Dollar was motivated to raise money for general use in SharkDreams' business. The investors, who were not commercial lenders, were motivated primarily by the profit that would be generated, including the high returns they were promised.

72.     As described above, the loans made in August 2019 and August 2020 contained future share components.

73.     A reasonable member of the investing public would consider the investments in D Dollar and Vera to be securities.

74.     No regulatory scheme or factor significantly reduced the risk of the investments in D Dollar and Vera, such that a court should not apply the federal securities laws to the note offerings.

75.     Nukarapu knew or was reckless in not knowing that the D Dollar bank account contained funds constituting investments in D Dollar, with the use of proceeds purpose for Vera, not SharkDreams.  Nukarapu knew that D Dollar accepted investment funds for Vera and he was the only signatory on the D Dollar bank account.

76.     Nukarapu owned and controlled D Dollar and conducted all aspects of its

business.  As described above, investors purchased Notes and other investments from D Dollar, purportedly for the proceeds to be used in what they understood was D Dollar's subsidiary Vera.

77.     However, after the funds were received by D Dollar, Nukarapu immediately transferred most of those investor funds from D Dollar to SharkDreams.  Nukarapu knowingly or recklessly misappropriated the investor proceeds to fund SharkDreams' operations and for his own personal use.  Nukarapu's conduct can be imputed to D Dollar because he controlled the company.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder**
**(All Defendants)**

78.     The Commission re-alleges and incorporates by reference herein paragraphs 1 through 77.

79.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have employed one or more devices, schemes, or artifices to defraud.

80.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

81.     By reason of the foregoing, Defendants directly or indirectly, singly or in concert, have violated and, unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(b) thereunder
### (Defendants Nukarapu and SharkDreams, Inc.)

82.     The Commission re-alleges and incorporates by reference herein paragraphs 1 through 77.

83.     Defendants Nukarapu and SharkDreams, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84.     By reason of the foregoing, Defendants Nukarapu and SharkDreams, directly or indirectly, singly or in concert, has violated and, unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)].

## THIRD CLAIM FOR RELIEF
### Violation of Sections 17(a)(1), (2) and (3) of the Securities Act
### (Defendants Nukarapu and SharkDreams, Inc.)

85.     The Commission re-alleges and incorporates by reference herein paragraphs 1 through 77.

86.     By reason of the conduct described above, Defendants Nukarapu and SharkDreams, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting knowingly, recklessly, or, as to (ii) and (iii), negligently (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

87.     By reason of the foregoing, Defendants Nukarapu and SharkDreams, directly or indirectly, singly or in concert, have violated, and unless enjoined will continue to violate, Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

## FOURTH CLAIM FOR RELIEF
### Violation of Sections 17(a)(1) and (3) of the Securities Act
### (Defendant D Dollar, Inc.)

88.     The Commission re-alleges and incorporates by reference herein paragraphs 1 through 77.

89.     By reason of the conduct described above, Defendant D Dollar, Inc., directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

90.     Defendant D Dollar, Inc., with scienter, employed devices, schemes and artifices

18

to defraud; and, with scienter and/or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit, upon the purchaser.

91.     By engaging in the conduct described above, Defendant D Dollar, Inc. violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

### FIFTH CLAIM FOR RELIEF
**Control Person Liability under Section 20(a) of the Exchange Act**
**(Defendant Nukarapu)**

92.     The Commission re-alleges and incorporates by reference herein paragraphs 1 through 77.

93.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], any person who, directly or indirectly controls an entity that is liable under any provision of the Exchange Act or any rule or regulation thereunder, shall also be jointly and severally liable with and to the same extent as that entity, unless the controlling person can establish that he acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

94.     As alleged above, Defendants SharkDreams and D Dollar violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

95.     At all relevant times, Defendant Nukarapu was the CEO and majority owner of SharkDreams and he possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Defendant SharkDreams.  Defendant Nukarapu was in charge of all activities in which SharkDreams engaged and was the sole decision-maker for the company.

19

96.     At all relevant times, Defendant Nukarapu was the sole owner of D Dollar and he possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Defendant D Dollar.  Defendant Nukarapu was in charge of all activities in which D Dollar engaged and was the sole decision-maker for the company.

97.     Defendant Nukarapu is therefore liable as a controlling person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for Defendants SharkDreams' and D Dollar's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Unless enjoined, Nukarapu will again engage in conduct that would render him liable, under Section 20(a) of the Exchange Act, for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.


## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

## I.

## Injunction

Permanently restraining and enjoining Defendants Nukarapu and SharkDreams and all persons in active concert or participation with any of them from violating Securities Act Sections 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and permanently restraining and enjoining Defendant D Dollar and all persons in active concert or participation with it from violating Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)] Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5];

## II.

### Conduct-Based Injunction Against Nukarapu

Issue an order against Defendant Nukarapu in accordance with Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5) and Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), permanently enjoining him from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Nukarapu from purchasing or selling securities for his own personal account;

## III.

### Conduct-Based Injunction Against SharkDreams and D Dollar

Issue an order against Defendants SharkDreams and D Dollar in accordance with Section 21(d)(5) of the Exchange Act,  15 U.S.C. § 78u(d)(5) and Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), permanently enjoining them from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security;

## IV.

### Officer and Director Bar

Issue an order against Defendant Nukarapu in accordance with Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d);

## V.

## <u>Disgorgement and Prejudgment Interest</u>

Ordering Defendants to disgorge on a joint and several basis, and with prejudgment interest, the ill-gotten gains and/or unjust enrichment they received directly or indirectly as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## VI.

## <u>Civil Penalty</u>

Ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

## VII.

## <u>Further Relief</u>

Granting any other and further relief this Court may deem just and proper for the benefit of investors.

## VIII.

## <u>Demand for Jury Trial</u>

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: September 11, 2023

Respectfully submitted,

_____/s/ Peter Lallas_____

Peter Lallas (NY Bar No. 4290623)
lallasp@sec.gov
(202) 256-3900
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F. Street, NE
Washington D.C. 20549